IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | |
|---|---|
| AUSTIN RYAN MOORE, | Civil Action No. 4:23-6274-SAL-TER |
| PLAINTIFF, | |
| vs. | REPORT AND RECOMMENDATION |
| NICHOLAS DERITIS,<br>EMERSON L. GROSS, | |
| DEFENDANTS. | |

**PROCEDURAL BACKGROUND**

Plaintiff, acting *pro se*, filed this action under 42 U.S.C. § 1983[1] on December 6, 2023, alleging a violation of his constitutional rights based on excessive force during an arrest. On January 30, 2024, Plaintiff filed an amended complaint. (ECF No. 10). On September 30, 2024, Defendants filed a motion for summary judgment along with a memorandum and exhibits. (ECF Nos. 45 and 46). As the Plaintiff was proceeding *pro se*, the court issued an order on or about October 1, 2024, pursuant to Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975), advising Plaintiff of the motion for summary judgment procedure and the possible consequences if he failed to respond adequately. On October 8, 2024, after receiving the transcript of the

---

[1] All pretrial proceedings in this case were referred to the undersigned pursuant to the provisions of 28 U.S.C. § 636(b)(1)(A) and (B) and Local Rule 73.02(B)(2)(d), DSC. Because this is a dispositive motion, the report and recommendation is entered for review by the district judge.

deposition of the Plaintiff, Defendants filed a supplemental memorandum in support of the motion for summary judgment attaching portions of the deposition. (ECF No. 50). On October 28, 2024, Plaintiff filed a response to the motion for summary judgment.[2] Plaintiff filed a supplemental response on November 18, 2024. (ECF No. 60).

## DISCUSSION

## STANDARD FOR SUMMARY JUDGMENT

The federal court is charged with liberally construing the complaints filed by pro se litigants, to allow them to fully develop potentially meritorious cases. See Cruz v. Beto, 405 U.S. 319 (1972); Haines v. Kerner, 404 U.S. 519 (1972). The court's function, however, is not to decide issues of fact, but to decide whether there is an issue of fact to be tried. The requirement of liberal construction does not mean that the court can ignore a clear failure in the pleadings to allege facts which set forth a federal claim, Weller v. Dep't of Social Servs., 901 F.2d 387 (4th Cir. 1990), nor can the court assume the existence of a genuine issue of material fact where none exists. If none can be shown, the motion should be granted. Fed. R. Civ. P. 56(c).

The moving party bears the burden of showing that summary judgment is

---

[2] On October 29, 2024, the court entered an order granting Plaintiff's motion to compel. (ECF No. 56). Therefore, Plaintiff was given additional time from the date of receipt of the discovery pursuant to the court's order of October 29, 2024, to file a supplemental response.

proper. Summary judgment is proper if there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Summary judgment is proper if the non-moving party fails to establish an essential element of any cause of action upon which the non-moving party has the burden of proof. Celotex, 477 U.S. 317. Once the moving party has brought into question whether there is a genuine dispute for trial on a material element of the non-moving party's claims, the non-moving party bears the burden of coming forward with specific facts which show a genuine dispute for trial. Fed.R.Civ.P. 56(e); Matsushita Electrical Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574 (1986). The non-moving party must come forward with enough evidence, beyond a mere scintilla, upon which the fact finder could reasonably find for it. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). The facts and inferences to be drawn therefrom must be viewed in the light most favorable to the non-moving party. Shealy v. Winston, 929 F.2d 1009, 1011 (4th Cir. 1991). However, the non-moving party may not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary judgment. Barber v. Hosp. Corp. of Am., 977 F.2d 874-75 (4th Cir. 1992). The evidence relied on must meet "the substantive evidentiary standard of proof that would apply at a trial on the merits." Mitchell v. Data General Corp., 12 F.3d 1310, 1316 (4th Cir. 1993).

To show that a genuine dispute of material fact exists, a party may not rest upon the mere allegations or denials of his pleadings. See Celotex, 477 U.S. at 324 (Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves). Rather, the party must present evidence supporting his or her position through "depositions, answers to interrogatories, and admissions on file, together with ... affidavits, if any." Id. at 322; see also Cray Communications, Inc. v. Novatel Computer Systems, Inc., 33 F.3d 390 (4th Cir. 1994); Orsi v. Kickwood, 999 F.2d 86 (4th Cir. 1993); Local Rules 7.04, 7.05, D.S.C.

## ALLEGTIONS/FACTS

Plaintiff alleges that he was subjected to excessive force during an arrest. 0Defendants argue Plaintiff was not subjected to excessive force and any force used was reasonable. Defendants have submitted a copy of the police report, video evidence from the body worn cameras (BWC) of Officers St. Clair and DeRitis. (Exhibits 3 and 9), video evidence from the patrol car while transporting Plaintiff to the police station, (Exhibit 5), the BWC of an officer once Plaintiff arrived at the jail. (Exhibit 4), and portions of Plaintiff's deposition (ECF No. 50-1). The undisputed facts are that Plaintiff was arrested in North Myrtle Beach, South Carolina, on September 25, 2023, for suspected automobile theft. Prior to being arrested, Plaintiff

fled when approached by Officer DeRitis ("DeRitis), and the officers pursued Plaintiff with DeRitis pushing Plaintiff from behind to the ground. The remaining facts are in dispute.

Plaintiff's version of the facts will be set forth based on his amended complaint, portions of his deposition, and the video evidence submitted by Defendants. Plaintiff admitted that he was in possession of a stolen vehicle and that while he had the hood up about to jump off the battery of the car, he heard someone say "move in" several times. (ECF No. 50-1). Plaintiff asserts that he only saw a "dark shape approachin' me and, yes, I knew the car was stolen, so I feared for my life. I didn't know who it was. I took off runnin', and that's where I fell the first time. I got back up. And as I was goin' to run again, the unknown person rounded the corner and blinded me with a flashlight and yelled, hey freeze, freeze, freeze, and then he pushed me to the ground. I didn't know who it was, so I was scared for my life." (Plaintiff's deposition, ECF No. 50-1 at 5). Due to failure to identify themselves, Plaintiff argues that he did not know it was the police telling him to freeze. Plaintiff admitted that he had a gun which he was not the legal owner of and that he threw it down while being chased in the area where he was "pushed down." Id. at 17. Plaintiff testified that he realized when he was being handcuffed that he was being arrested and not being chased by a random person. (Id. at 7). Plaintiff was handcuffed by DeRitis but stated he did not

5

recall which officer told him to stop or which officer pushed him. Id. However, after reviewing body-camera footage and receiving discovery documents, Plaintiff stated that he discovered it was DeRitis that pushed him to the ground. Id. Plaintiff testified that after he was pushed and DeRitis placed him in handcuffs with two other officers assisting, no other force was used and there was no other weapon used that night. Id. at 8. After he was restrained, Plaintiff was helped up by the officers and read his Miranda rights. Id. Plaintiff testified " . . . that night as I was on the ground, multiple officers were standin' on me and you could clearly see in the video, one of the video, one of the officers has his knee on my neck which isn't allowed too." Id. at 8-9. Plaintiff did not recall which officer had his knee on his neck but thought from the video that it was "either St. Clair or Emerson Gross. I'm not sure." Id. at 9. In the amended complaint, Plaintiff alleged that he told the officers when they first helped him to his feet that his left leg/knee was in pain and he needed medical attention. (ECF No. 10 at 6). However, Plaintiff testified at his deposition that he did tell the officers that he had a prior injury from 2021 to his right leg but did not tell them about his left leg injury because he did not "notice it" until after the door to the patrol car was being shut. (Id. at 11-12). Plaintiff testified that he told the officer transporting him to the jail about the injury to his left leg and requested medical assistance. Id. at 12. After reviewing the video evidence from the BWC of the transporting officer, Plaintiff

testified that he told the transporting officer that he "might have dislocated his knee" and needed it looked at because he was not sure. Id. at 13. The officer responded that they would have medical examine his knee when they arrived a the police station which was about a five to seven minute ride. Id. Plaintiff testified that he was at the jail for about thirty minutes before medical personnel arrived to examine him and transport him to the hospital where x-rays revealed he had a broken kneecap. Id. at 14. Plaintiff testified that it was Defendant DeRitis that placed him in handcuffs and that Officer Gross was named as a defendant because he was present and failed to identify himself as a police officer. Id.at 15.  Plaintiff alleges excessive force "due to the fact they took me to the police dept. first instead of hospital for medical attention." (Amended complaint, ECF No. 10, at 4).

Defendants submitted the video evidence from the BWC of DeRitis and the police report he prepared. (ECF No. 46-1 at 2; Exhibit 3.). DeRitis reported that on September 25, 2023, officers were informed of a possible suspect, Mr. Austin Ryan Moore, involved in multiple "B & E autos that occurred on the night prior within the city of North Myrtle Beach." (Exhibit 46-1 at 2). When Officers DeRitis and Gross arrived at Plaintiff's last known address, they were informed that Plaintiff no longer resided there but was last seen in a black Nissan. Id.  Upon DeRitis arriving at the address listed on Plaintiff's driver's license, he observed a black Nissan backed into

7

a parking spot. Id. After providing the vehicle identification number to North Myrtle Beach dispatch, DeRitis was advised that the black Nissan was stolen out of Louisville, Kentucky. Id. DeRitis watched the vehicle for Plaintiff's return, from an unmarked police vehicle in the adjacent parking lot from where the Nissan was parked. Id. Based on the videos from the BWC of DeRitis and St. Clair, there were street lights in the parking lot and porch lights on at some of the apartments in the area where DeRitis first approached Plaintiff and where Plaintiff began to flee. The area where DeRitis pushed Plaintiff down was not fully illuminated. At approximately 12:00 a.m., DeRitis observed a white male wearing all black approach the vehicle from the direction of the apartment area and the decision was made to approach Plaintiff. Id. As DeRitis approached Plaintiff, he began to run. Id. DeRitis reported that he announced himself and gave several orders to freeze which Plaintiff ignored. Id. The video from BWC shows an incident which unfolded rapidly. The video from the BWC of DeRitis confirms that despite him approaching Plaintiff in uniform and yelling for him to "freeze" several times, Plaintiff ignored the commands and fled on foot.[3] ( Id. at 2, and Exhibit 3, BWC 0:01:23-0:01:42). Plaintiff fell when he initially began to run, got back up and continued to run from DeRitis. (Id.). When Plaintiff

---

[3] If DeRitis did announce that he was Police, it is not heard in the audible portion of the video evidence from the BWC of DeRitis. (Exhibit 3). However, Officer St. Clair announced they were police while in pursuit of Plaintiff before he was pushed down by DeRitis. (Exhibit 9).

made a right turn behind the apartment building, DeRitis caught up to Plaintiff and pushed him from behind. Plaintiff fell to the ground and DeRitis fell on top of him. (Id.; Exhibit 3 at 0:01:42). Officer St. Clair arrived after DeRitis had Plaintiff on the ground with his arms/hands straight out in front of him. (ECF No. 46-1 at 22). Corporal Hall also arrived on scene and assisted Officers DeRitis and St. Clair in detaining Plaintiff in handcuffs. (Id. and see Exhibit 2, BWC 0:01:44 ). The officers were able to gain control of Plaintiff's hands and place him in handcuffs in less than two minutes. Id. Once in handcuffs, DeRitis and another officer assisted Plaintiff off the ground (Exhibit 3 at 00:02:50) and to the patrol car where he was searched and read his Miranda rights. (ECF No. 46-1 at 2-3). Several items of illegal paraphernalia were found on Plaintiff's person. (Id. at 3, Exhibit 3 and 9).  Plaintiff confirmed his identity. Id. at 3.  While Plaintiff was being searched, Plaintiff informed the officers that he had a prior injury to the femur in his right leg. (Exhibit 3, at 00:05:09; Exhibit 9 at 00:05:08). After another officer observed Plaintiff limping to the patrol car and asked if he was okay, Plaintiff again repeated that he had a prior injury to the femur in his right leg from 2021. (Id. at 00:06:25; Exhibit 9 at 00:06:25). Plaintiff did not make any mention of an injury to his left knee or leg at that point in time which Plaintiff confirmed at his deposition. Plaintiff was transported to the North Myrtle Beach jail without further incident. Id. at 3. DeRitis searched the area where Plaintiff

9

fell for any items Plaintiff may have dropped. Id. Approximately three feet from where Plaintiff was laying, DeRitis located a loaded handgun laying on the ground. Id.

While being transported, Plaintiff informed the officer in the patrol vehicle that "I might have dislocated my knee, I'm not sure yet." (Exhibit 5, at 00:12:07). The officer informed Plaintiff that he would have medical personnel examine Plaintiff upon arrival at the jail. (Exhibit 5 at 00:12:20). Plaintiff and the officer arrived at the jail and Plaintiff was taken inside. (Exhibit 5 at 00:16:07-45).

Once inside the station, an officer asked Plaintiff if he needed medical attention to which Plaintiff responded in the affirmative. (Exhibit 4 at 00:26:39). Approximately one minute later ( Id. at 00:27:31), the officer stated that he was going to have medical requested and walked to another room and instructed employees to call medical personnel to come to attend to Plaintiff. ( Id. at 00:27:45). While waiting on medical to arrive, Plaintiff told the officer that he did not feel a problem with his knee at first and did not feel there was a problem until "about two minutes after they put me in the car." (Id. at 00:33: 12). Medical arrived and placed Plaintiff on a stretcher for transport to the hospital. (Id. at 00:37:37 to 00:39:31).

Defendants argue that Plaintiff's clam for excessive force should be dismissed because no reasonable juror could find that they used excessive force against Plaintiff

based on the record before the Court. Defendants argue, even assuming excessive force, they are nonetheless entitled to qualified immunity.

Plaintiff filed both a response and a supplemental response to the motion for summary judgment. (ECF Nos. 55 and 60). In his responses, Plaintiff argues that the officers' uniforms did not have the word POLICE across the chest; that other than Officer St. Clair announcing it as Plaintiff was being pushed down, the officers did not announce themselves as police officers; that the area was not illuminated by street lights such that Plaintiff could not identify them as police officers; that he fled; and, he was not wanted for a violent offense but for possession of a stolen vehicle. Id. Therefore, Plaintiff argues that there are material facts for which the motion for summary judgment should be denied.

## ANALYSIS

A claim that "law enforcement officials used excessive force in the course of making an arrest, investigatory stop, or other 'seizure' of his person ... [is] properly analyzed under the Fourth Amendment's 'objective reasonableness' standard." Graham v. Connor, 490 U.S. 386, 388 (1989). In applying the objective reasonableness standard, "the question is whether a reasonable officer in the same circumstances would have concluded that a threat existed justifying the particular use of force." Elliott v. Leavitt, 99 F.3d 640, 642 (4th Cir. 1996) (citing Graham, 490 U.S.

at 396–97).

"The Fourth Amendment prohibition on unreasonable seizures bars police officers from using excessive force to seize a free citizen." Graham v. Connor, 490 U.S. 386, 395 (1989). This Court must analyze whether an officer's actions were objectively reasonable in determining if the force brought to bear was excessive. Id.; Stanton v. Elliott, No. 21-1197, 2022 WL 288012, at *4 (4th Cir. Feb. 1, 2022) (citing Elliott v. Leavitt, 99 F.3d 640, 642–43 (4th Cir. 1996)); E.W. by & through T.W. v. Dolgos, 884 F.3d 172, 179 (4th Cir. 2018). "Determining the reasonableness of an officer's actions 'requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake.' " Dolgos, 884 F.3d at 179 (quoting Graham, 490 U.S. at 396); Jones v. Buchanan, 325 F.3d 520, 527 (4th Cir. 2003).

Courts evaluate the following three factors when determining if the force used by an officer was reasonable: "[1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether he is actively resisting arrest or attempting to evade arrest by flight." Dolgos, 884 F.3d at 179 (quoting Graham, 490 U.S. at 396). Courts may additionally consider "other 'objective circumstances potentially relevant to a determination of excessive force.' " Id. (quoting Kingsley v. Hendrickson, 135 S. Ct. 2466, 2473 (2015)). For

example, the "extent of the plaintiff's injuries is also a relevant consideration." Buchanan, 325 F.3d at 527. However, "[s]ubjective factors involving the officer's motives, intent, or propensities are not relevant." Pegg v. Herrnberger, 845 F.3d 112, 120 (4th Cir. 2017) (quoting Rowland v. Perry, 41 F.3d 167, 173 (4th Cir. 1994)). "The ultimate question is whether the totality of the circumstances justified a particular sort of seizure." Dolgos, 884 F.3d at 179 (quotations and citations omitted).

The doctrine of qualified immunity shields officers from civil liability so long as their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Pearson v. Callahan, 555 U.S. 223, 231 (2009). It protects "all but the plainly incompetent or those who knowingly violate the law." District of Columbia v. Wesby, 138 S. Ct. 577, 589 (2018) (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)). Under the well-known analysis of Saucier v. Katz, 533 U.S. 194 (2001), the Court must ask two questions: (1) "whether a constitutional violation occurred"; and (2) "whether the right violated was clearly established." Henry, 652 F.3d at 531. The courts are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." Pearson v. Callahan, 555 U.S. 223, 236 (2009). If a court decides in the negative the first prong it considers—i.e., the court decides the plaintiff has not alleged the

deprivation of an actual constitutional right or the right was not clearly established at the time of the alleged violation—the court need not consider the other prong of the qualified immunity analysis. See id. at 243–45; Torchinsky v. Siwinski, 942 F.2d 257, 260 (4th Cir. 1991) (holding the court "need not formally resolve" the constitutional question of "whether the [plaintiffs] were arrested without probable cause" to address the plaintiffs' § 1983 claim; the court stated that it "need only determine whether [the defendant]—a deputy sheriff performing within the normal course of his employment—acted with the objective reasonableness necessary to entitle him to qualified immunity"). Accordingly, if the answer to either question is no, immunity attaches.

Here, in considering the Graham balancing analysis, the evidence indicates that Plaintiff fled on foot when DeRitis approached him in uniform and told him to "freeze." (Exhibit 3).[4] Plaintiff was given several commands to stop but failed to obey the commands and continued to run. The pursuit ended with DeRitis pushing Plaintiff to the ground to apprehend and handcuff him without further incident. (Exhibit 3 at

---

[4] "There is no established rule, nor should there be a requirement, that the police must announce their presence *prior* to making an arrest in public. Even after execution of an arrest, the police need not immediately inform the arrestee of the reasons for the arrest." Austin v. Town of Blacksburg, 66 F. Supp. 2d 771, 776 (W.D. Va. 1998), aff'd sub nom. Taylor ex rel. Austin v. Town of Blacksburg, 188 F.3d 503 (4th Cir. 1999) citing Williams v. Schario, 93 F.3d 527, 528–29 (8th Cir.1996); Kladis v. Brezek, 823 F.2d 1014, 1018 (7th Cir.1987).

00:01:42 to 00:02:50). Plaintiff was informed that he had active warrants out on him. At his deposition, Plaintiff admitted that he was in possession of a stolen vehicle, he fled, and was in possession of a firearm that did not belong to him. Accordingly, this factor weighs in Defendants' favor.

The second and third factors also weigh in Defendants' favor. The video evidence depicts that while Plaintiff was being non-compliant with commands to "freeze" and continuing to flee on foot, he was pushed down from behind with no other force being used. (Exhibits 3 and 9). The video evidence also depicts that DeRitis fell to the ground while pushing the Plaintiff to the ground and two other officers assisted with handcuffing Plaintiff. Id. After being pushed down, Plaintiff was handcuffed, helped off the ground, and read his Miranda rights without further incident. Id. Plaintiff was then escorted and placed into the patrol car for transport. Id. Plaintiff testified in his deposition that he was only "pushed to the ground" and DeRitis did not use any further type of force. DeRitis and the other officers were aware that Plaintiff was wanted for automobile theft, had active outstanding warrants, and was fleeing from the officers. Further, Plaintiff refused to comply with demands to stop, and the officers were attempting to gain control of the situation as quickly as possible. The videos (Exhibits 3 and 9) demonstrate and Plaintiff testified at his deposition that as soon as the officers were able to gain control and secure the

Plaintiff, no further force was used. The undersigned is mindful of the need for split-second decisions made by law enforcement officers under such circumstances and the need to quickly gain order and safety.[5] Based on a totality of the circumstances, Defendants did not violate Plaintiff's Fourth Amendment rights and, therefore, Defendants would also be entitled to qualified immunity under the first prong of the analysis. Thus, it is recommended that Defendants' motion for summary judgment be granted as to the allegations of excessive force during the arrest.

**MEDICAL INDIFFERENCE**

As to any claim Plaintiff may be attempting to make with regard to medical indifference on the part of these Defendants, it fails. Plaintiff appears to allege a claim of medical indifference as to these Defendants for failure to take him straight to the hospital due to an injury to his knee during the arrest before taking him to the police station. Under Short v. Hartman, 87 F.4th 593, 607 (4th Cir. 2023), the standard for reviewing medical indifference claims by pretrial detainees is substantially the same as that set forth above for conditions of confinement:

> (1) the [plaintiff] had a medical condition or injury that posed a substantial risk of serious harm; (2) the defendant intentionally, knowingly, or recklessly acted or failed to act to appropriately address the risk that the condition posed; (3) the defendant knew or should have

---

[5] Because no constitutional violation occurred, we need not reach the second prong of the qualified immunity inquiry.

> known (a) that the [plaintiff] had that condition and (b) that the defendant's action or inaction posed an unjustifiably high risk of harm; and (4) as a result, the [plaintiff] was harmed.

Short, 87 F.4th at 611. Here, Plaintiff fails to show that these Defendants knew of any injury to Plaintiff's knee during the arrest. The video evidence from the BWC reveals that Plaintiff only told the officers of a prior injury to the femur bone in his right leg from 2021. (Exhibit 3 at 00:05:09 and Exhibit 9 at 00:05:08). Plaintiff did not tell the Defendant officers about an injury to his left knee during the chase and arrest. Id. In fact, from the BWC worn at the time of the arrest, the video evidence reveals that Plaintiff was asked if he was injured because he was limping and he again stated that it was from a prior injury to his femur in 2021. (Exhibit 3 at 00:06:25 and Exhibit 9 at 00:06:21-25). Additionally, from the BWC of the officer at the jail (Exhibit 4), Plaintiff was asked if he needed medical care within minutes of arriving at the jail. (Id. at 00:26:39). After Plaintiff responded to the officer that he needed medical attention for his knee injury, medical was called within a couple of minutes to come for Plaintiff. (Exhibit 4 at 00:26:39-00:27:47). Plaintiff stated to the officer that he did not even realize his knee was injured until approximately two minutes after being placed in the patrol car. (Exhibit 4 at 00:33:12-19). Plaintiff agreed with the officer that he probably did not feel the pain in his knee at first due to his adrenaline running high. (Exhibit 4 at 00:33:19). Medical arrived to take Plaintiff to the hospital approximately

ten minutes later. (Exhibit 4 at 00:37:37).

Plaintiff has failed to show that the Defendants knew or should have known of his knee injury at the time of the arrest and has failed to show that Defendants intentionally, knowingly or recklessly acted or failed to act to appropriately address the risk that the condition posed. Plaintiff stated that he did not feel the pain in his knee until two minutes after he was in the patrol car where he then informed the officer driving. Plaintiff testified and the video evidence depicts that these two Defendants were not informed that Plaintiff had injured his knee during the pursuit. Therefore, Plaintiff has failed to show that the Defendants' actions or inactions were objectively unreasonable.

## **ELEVENTH AMENDMENT IMMUNITY**

Defendants argue that they are immune from suit pursuant to the Eleventh Amendment of the constitution. Defendants argue that Plaintiff's claims against them, in their official capacity, fail as a matter of law, as they are not a "person" amendable to suit and are entitled to immunity.

When a defendant is sued in his or her official capacity, the suit is frequently intended as one against the state, the real party in interest. If review of the pleadings indicates that the state is, in fact, the party being sued, then a judgment awarding damages is precluded by the Eleventh Amendment of the United States Constitution.

Although declaratory and/or injunctive relief may be granted, damages may not be awarded against the state. The Eleventh Amendment immunity granted to the states "applies only to States or governmental entities that are considered 'arms of the State' for Eleventh Amendment purposes," but the court found that state agencies, divisions, departments and officials are entitled to the Eleventh Amendment immunity. Will v. Michigan Department of State Police, 491 U.S. 58, 70 (1989). In reaching this conclusion, the court held that a suit against state officials acting in their official capacities is actually against the office itself, and therefore, against the state. State officials may only be sued in their individual capacities.

The United States Supreme Court has long held the Eleventh Amendment also precludes suits against a state by one of its own citizens. See Edelman v. Jordan, 415 U.S. 651, 662–63 (1974). A plaintiff "is not entitled to monetary damages under § 1983 against Defendants in their official capacities." Moneyhan v. Keller, 563 F. App'x 256, 258 (4th Cir. 2014) (citing Cromer v. Brown, 88 F.3d 1315, 1332 (4th Cir. 1996) (holding that Eleventh Amendment bars suits against non-consenting state, its agencies, and its officers acting in their official capacities)). However, suits for damages against state officials sued in their individual capacity are not barred by the Eleventh Amendment. See Hafer v. Melo, 502 U.S. 21, 30–31 (1991) ("[T]he Eleventh Amendment does not erect a barrier against suits to impose 'individual and

personal liability' on state officials under § 1983.") (citation omitted).

To the extent Plaintiff sues Defendants in their official capacities, they are not subject to suit under §1983, and it is recommended that Defendants' motion for summary judgment be granted regarding claims brought against them in their official capacity for monetary damages.

## **CONCLUSION**

Accordingly, it is recommended that Defendants' motion for summary judgment (ECF No. 46) be granted.

February 6, 2025  
Florence, South Carolina

s/Thomas E. Rogers, III  
Thomas E. Rogers, III  
United States Magistrate Judge

The parties' attention is directed to the important notice on the next page.